[Cite as *Northeast Ohio Regional Sewer Dist. v. Bath Twp.*, 2013-Ohio-4186.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 98728 and 98729**

# NORTHEAST OHIO REGIONAL SEWER DISTRICT

PLAINTIFF-APPELLEE
CROSS-APPELLANT

vs.

# BATH TOWNSHIP, OHIO, ET AL.

DEFENDANTS-APPELLANTS
CROSS-APPELLEES

**JUDGMENT:**
AFFIRMED IN PART; REVERSED IN PART

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-714945

**BEFORE:** S. Gallagher, J., Jones, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** September 26, 2013

**ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES**

**For the city of Beachwood, city of Bedford Heights, city of Cleveland Heights, village of Glenwillow, city of Independence, city of Lyndhurst, city of North Royalton, village of Oakwood, city of Olmsted Falls, and city of Strongsville**

John H. Gibbon
City of Cleveland Heights Director of Law
40 Severance Circle
Cleveland Heights, Ohio   44118

Christopher L. Gibbon
Heather R. Baldwin Vlasuk
Walter & Haverfield L.L.P.
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio   44114

**For the city of Brecksville**

David J. Matty
City of Brecksville Director of Law
Shana A. Samson
Justin Whelan
Matty, Henrikson & Greve
55 Public Square, Suite 1775
Cleveland, Ohio   44113

**For the city of Lyndhurst**

Paul T. Murphy
City of Lyndhurst Director of Law
Paul T. Murphy Co., L.P.A.
5843 Mayfield Road
Mayfield Heights, Ohio   44124

**ATTORNEYS FOR APPELLEE/CROSS-APPELLANT**

**For N.E.O.R.S.D.**

Mark I. Wallach
Thacker Martinsek L.P.A.
2330 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio   44114

James F. Lang
Molly A. Drake
Matthew J. Kucharson
Calfee, Halter & Griswold L.L.P.
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio   44114

Marlene Sundheimer
Director of Law
N.E.O.R.S.D.
3900 Euclid Avenue
Cleveland, Ohio   44115

**Also listed:**

**For Bath Township, Ohio, et al.**

Sherri Bevan Walsh
Summit County Prosecutor

Mary Ann Kovach
Michael D. Todd,
Marvin D. Evans
Summit County Assistant Prosecuting Attorneys
53 University Avenue, 6th Floor
Akron, Ohio   44308

**For the city of Beachwood, et al.**

Stephen M. O'Bryan
Taft, Stettinius & Hollister L.L.P.
200 Public Square
Suite 3500
Cleveland, Ohio   44114

Rebecca K. Schaltenbrand
Ice Miller L.L.P.
600 Superior Avenue, East, Suite 1701
Cleveland, Ohio   44114

**For the city of Bedford**

Kenneth A. Schuman
City of Bedford Director of Law
5306 Transportation Blvd.
Garfield Heights, Ohio   44125

Charles A. Bakula
30285 Bruce Industrial Parkway
Suite C – 2nd Floor
Solon, Ohio   44139

**For the city of Bedford Heights**

Ross S. Cirincione
Law Director
City of Bedford Heights
Castleton Building
5306 Transportation Blvd.
Garfield Heights, Ohio   44125

**For the city of Berea**

Gregory M. Sponseller
11 Berea Commons
Berea, Ohio   44017

**For the village of Boston Heights**

Constance A. Hesske
1655 W. Market Street, Suite 350
Akron, Ohio   44313

Charles T. Riehl
Walter & Haverfield, L.L.P.
The Tower at Erieview, Suite 3500
1301 East Ninth Street
Cleveland, Ohio   44114

**For the city of Brecksville**, **et al.**

David J. Matty
City of Brecksville Director of Law
Justin Whelan
Erin Hooper
Shana A. Samson
Matty, Henrikson & Greve
55 Public Square, Suite 1775
Cleveland, Ohio   44113

**For the city of Broadview Heights**

Vince Ruffa
City of Broadview Heights Director of Law
Ann C. Oakar
Oakar & Ruffa
1000 W. Wallings Road, Suite A
Broadview Heights, Ohio   44147

**For the city of Brook Park**

Neal M. Jamison
City of Brook Park Director of Law
Largent, Berry, Preston & Jamison Co.
1 Berea Commons, Suite 216
Berea, Ohio   44017

**For the city of Brooklyn**

Scott Claussen

Director of Law
City of Brooklyn
7619 Memphis Avenue
Brooklyn, Ohio   44144

**For the village of Brooklyn Heights**

Jerome E. Dowling
Brooklyn Heights Director of Law
20800 Center Ridge Road, Suite 222
Rocky River, Ohio   44116

**For the city of Cleveland**

Barbara A. Langhenry
Director of Law
Catherine Ma
Shirley A. Tomasello
Assistant Directors of Law
Julianne Kurdila
City of Cleveland
City Hall
601 Lakeside Avenue, Room 106
Cleveland, Ohio   44114

**For the city of Cleveland Heights**

William R. Hanna
Walter & Haverfield L.L.P.
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio   44114
**For Columbia Township**

Dennis Will
Lorain County Prosecutor
Gerald A. Innes
Assistant County Prosecutor
225 Court Street, 3rd Floor
Elyria, Ohio   44035

**For the village of Cuyahoga Heights, et al.**

Jonathan D. Greenberg
Cuyahoga Heights Director of Law
Aimee W. Lane
Walter & Haverfield L.L.P.
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio   44114

**For the city of East Cleveland**

Ronald K. Riley
Director of Law
City of East Cleveland
14340 Euclid Avenue
East Cleveland, Ohio   44112

**For the city of Euclid**

L. Christopher Frey
Director of Law
City of Euclid
585 East 222nd Street
Euclid, Ohio   44123
**For the city of Garfield Heights**

Tim Riley
City of Garfield Heights Director of Law
800 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113

Kevin P. Weiler
Assistant Law Director
City of Garfield Heights
8920 Brecksville Road
Brecksville, Ohio   44125

**For the village of Glenwillow**

Stephen M. Klonowski
Village of Glenwillow Director of Law

Reddy, Grau & Meek
The Castleton Building
5306 Transportation Blvd.
Garfield Heights, Ohio   44125

**For the city of Highland Heights**

Timothy G. Paluf
Highland Heights Director of Law
1540 Leader Building
526 Superior Avenue
Cleveland, Ohio   44114

**For the village of Highland Hills**

Thomas P. O'Donnell
Village of Highland Hills Law Director
3700 Northfield Road, Suite 11
Cleveland, Ohio   44122
**For the city of Hudson, et al.**

R. Todd Hunt
City of Hudson City Solicitor
Walter & Haverfield
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio   44114

**For the city of Independence**

Gregory J. O'Brien
City of Independence Director of Law
Taft, Stettinius & Hollister
200 Public Square
Suite 3500
Cleveland, Ohio   44114

**For the city of Lakewood**

Kevin M. Butler
Director of Law
City of Lakewood

12650 Detroit Road
Lakewood, Ohio    44107

**For the village of Linndale**

George T. Simon
Grendell & Simon Co., L.P.A.
6638 Harris Road, 2nd Floor
Broadview Heights, Ohio    44147
**For the city of Lyndhurst**

Paul T. Murphy
City of Lyndhurst Director of Law
Paul T. Murphy Co., L.P.A.
5843 Mayfield Road
Mayfield Heights, Ohio   44124

David M. Maistros
34 South Main Street
Suite 2-B
Chagrin Falls, Ohio    44022

**For the city of Macedonia, et al.**

Joseph W. Diemert, Jr.
City of Macedonia Law Director
Mark V. Guidetti
Thomas M. Hanculak
Joseph W. Diemert, Jr. & Assoc.
1360 S.O.M. Center Road
Cleveland, Ohio    44124

**For the city of Maple Heights, et al.**

John J. Montello
City of Maple Heights Law Director
Blair N. Melling
Melling, Melling & Bell
303 Columbus Road
Bedford, Ohio    44146

**For the city of Mayfield Heights**

L. Bryan Carr
The Carr Law Firm
1392 S.O.M. Center Road
Mayfield Hts., Ohio    44124
**For Mayfield Village**

Joseph W. Diemert, Jr.
Mayfield Village Director of Law
Diane A. Calta
Assistant Law Director
Joseph W. Diemert, Jr. & Assoc.
1360 S.O.M. Center Road
Cleveland, Ohio    44124

**For the city of Middleburg Heights**

Peter H. Hull
Law Director
City of Middleburg Heights
15700 E. Bagley Road
Middleburg Hts., Ohio    44130

**For the village of Moreland Hills, et al.**

Margaret A. Cannon
Village of Moreland Hills Director of Law
Walter & Haverfield L.L.P.
1301 East Ninth Street, Suite 3500
Cleveland, Ohio    44114

Rebecca K. Schaltenbrand
Ice Miller L.L.P.
600 Superior Avenue, East
Suite 1701
Cleveland, Ohio    44114

**For the village of Newburgh Heights**

Luke F. McConville
Village of Newburgh Heights Director of Law
Waldheger - Coyne

1991 Crocker Road, Suite 550
Westlake, Ohio    44145
**For the village North Randall**

Leonard A. Spremulli
Village of North Randall Director of Law
29325 Chagrin Blvd., Suite 305
Pepper Pike, Ohio    44122

**For the city of North Royalton**

Thomas A. Kelly
City of North Royalton Law Director
Donna M. Vozar
Assistant Law Director
City of North Royalton
13834 Ridge Road
North Royalton, Ohio    44133

**For the village of Northfield**

Bradric T. Bryan
Village of Northfield Law Director
Goodwin, Bryan & Schill
22050 Mastick Road
Fairview Park, Ohio    44126

**For the village of Oakwood**

Stephen M. Klonowski
Village of Oakwood Law Director
Reddy, Grau & Meek
The Castleton Building
5306 Transportation Blvd.
Garfield Heights, Ohio    44125

**For Olmsted Township**

Olmsted Township
c/o Jim Carr, Trustee
26900 Cook Road
Olmsted Township, Ohio    44138

**For Orange Village**

Stephen L. Byron
Orange Village Director of Law
Walter & Haverfield L.L.P.
4230 State Route 306, Suite 240
Willoughby, Ohio    44094

**For the city of Parma**

Timothy G. Dobeck
Director of Law
City of Parma
6611 Ridge Road
Parma, Ohio    44129

**For the city of Parma Heights**

Marcia E. Hurt
C. Anthony Stavole
Stavole & Miller
202 West Moreland Building
5700 Pearl Road
Cleveland, Ohio    44129

**For the city of Pepper Pike**

Stephen L. Byron
Law Director
City of Pepper Pike
28000 Shaker Boulevard
Pepper Pike, Ohio    44124
**For the village of Richfield, et al.**

William R. Hanna
Village of Richfield Director of Law
Charles T. Riehl
Walter & Haverfield L.L.P.
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio    44114

**For the city of Richmond Heights**

R. Todd Hunt
City of Richmond Heights Director of Law
Walter & Haverfield L.L.P.
The Tower at Erieview
1301 East Ninth Street, Suite 3500
Cleveland, Ohio    44114

**For Sagamore Hills Township**

Jeffrey J. Snell
Sagamore Hills Township Director of Law
253 W. Aurora Road, Suite 200
Sagamore Hills, Ohio    44067

**For the city of Seven Hills**

Richard Pignatiello
Law Director
City of Seven Hills
7325 Summitview Drive
Seven Hills, Ohio    44131
**For the city of Shaker Heights**

William M. Ondrey Gruber
City of Shaker Heights Director of Law
Margaret Anne Cannon
City of Shaker Heights
3400 Lee Road
Shaker Heights, Ohio    44120

**For the city of Solon**

David J. Matty
Erin Hooper
Shana A. Samson
Matty, Henrikson & Greve
55 Public Square, Suite 1775
Cleveland, Ohio    44113

**For the city of South Euclid**

Michael P. Lograsso
Law Director
City of South Euclid
1349 South Green Road
South Euclid, Ohio    44121

**For the city of Strongsville**

Kenneth Kraus
Law Director
City of Strongsville
16099 Foltz Industrial Pkwy.
Strongsville, Ohio    44149

Daniel J. Kolick
Kolick & Kondzer
Westlake Centre, Suite 110
24650 Center Ridge Road
Westlake, Ohio    44145

**For the city of Twinsburg**

David M. Maistros
Law Director
City of Twinsburg
10075 Ravenna Road
Twinsburg, Ohio    44087

**For the city of University Heights**

Anthony Coyne
Director of Law
Kenneth J. Fisher
City of University Heights
2300 Warrensville Center Road
University Heights, Ohio    44118

**For the village of Valley View**

David A. Lambros

Village of Valley View Prosecutor
Largent, Berry, Preston & Jamison Co.
1 Berea Commons, Suite 216
Berea, Ohio    44017

**For the village of Walton Hills**

Blair N. Melling
Village of Walton Hills Solicitor
Melling, Melling & Bell
303 Columbus Road
Bedford, Ohio    44146
**For the city of Warrensville Heights**

Theresa Beasley
Law Director
Sean P. Ruffin
City of Warrensville Heights
4301 Warrensville Center Road
Warrensville Heights, Ohio    44128

**For the city of Willoughby Hills**

Thomas G. Lobe
City of Willoughby Hills Law Director
Thomas G. Lobe Co., L.P.A.
614 West Superior Avenue
Suite 1300
Cleveland, Ohio    44113

**For Intervening Property Owners**

Jordan B. Berns
Sheldon Berns
Timothy J. Duff
Benjamin J. Ockner
Gary F. Werner
Berns, Ockner & Greenberger
3733 Park East Drive, Suite 200
Beachwood, Ohio    44122

**For Intervenor the Cleveland Metropolitan School District Board of Education**

Brian E. Ambrosia
Adrian D. Thompson
Taft, Stettinius & Hollister
200 Public Square, Suite 3500
Cleveland, Ohio    44114

**For Intervenors Bishop Richard G. Lennon, et al.**

Michael E. Cicero
Matthew T. Fitzsimmons, III
L. James Juliano, Jr.
Nicola, Gudbranson & Cooper
Republic Bldg., Suite 1400
25 West Prospect Avenue
Cleveland, Ohio    44115

**For Intervenor Cleveland Branch National Association for the Advancement of Colored People**

William H. Smith
William H. Smith & Associates
940 Rockefeller Building
614 W. Superior Avenue
Cleveland, Ohio    44113

**For Amici Curiae**

**For C.O.R.D.**

John B. Albers
Eric J. Luckage
Albers & Albers
88 North Fifth Street
Columbus, Ohio    43215

**For N.A.C.W.A., et al.**

Nathan Gardner-Andrews
National Association of Clean Water Agencies
1816 Jefferson Place, NW
Washington, D.C.    20036

SEAN C. GALLAGHER, J.:

{¶1} Defendants-appellants/cross-appellees appeal (1) the trial court's judgment denying their motion to dismiss; (2) the trial court's judgment granting partial summary judgment in favor of plaintiff-appellee/cross-appellant; and (3) the trial court's opinion issued after a bench trial and the supplemental judgment entry.

**{¶2}** Plaintiff-appellee/cross-appellant cross-appeals from partial findings in the trial court's opinion issued after the bench trial.[1]

## I.   The Parties

**{¶3}** Plaintiff-appellee/cross-appellant is the Northeast Ohio Regional Sewer District ("the Sewer District" or "the District").

**{¶4}** Of the 56 member communities in the Sewer District named in the action ("member communities"), 11 appealing communities ("appealing communities") are among the defendants-appellants/cross-appellees that have appeared and litigated in this appeal.[2]   Defendants-appellants/cross-appellees also consist of a group of intervening property owners located in the Sewer District (collectively "appellants").[3]

## II.   Background

---

[1] Amicus briefs have been filed in support of plaintiff-appellee/cross-appellant by (1) the National Association of Clean Water Agencies, the National Association of Flood and Stormwater Management Agencies, the American Public Works Association, American Rivers, and the Association of Ohio Metropolitan Wastewater Agencies; and (2) the Coalition of Ohio Regional Districts ("CORD").

[2] The appealing communities are Beachwood, Bedford Heights, Brecksville, Cleveland Heights, Glenwillow, Independence, Lyndhurst, North Royalton, Oakwood Village, Olmsted Falls, and Strongsville.

[3] The intervening property owners are The Greater Cleveland Association of Building Owners and Managers; Cleveland Automobile Dealers Association; The Northern Ohio Chapter of NAIOP; The Association for Commercial Real Estate; CADA Properties, L.L.C.; The Ohio Council of Retail Merchants; Snowville Service Associates L.L.C.; Boardwalk Partners, L.L.C.; Creekview Commons, L.L.C.; Fargo Warehouse, L.L.C.; Greens of Lyndhurst, Ltd.; Highlands Business Park, L.L.C.; JES Development Ltd.; Lakepoint Office Park, L.L.C.; Landerbrook Point, L.L.C.; Newport Square, Ltd.; Park East Office Park, L.L.C.; Shaker Plaza, Ltd.; Pavilion Properties, L.L.C.; and WGG Development, Ltd.

{¶5} In 1972, by judgment of the Cuyahoga County Court of Common Pleas and pursuant to R.C. Chapter 6119, the Sewer District was officially organized and declared a political subdivision of the state of Ohio.[4] The necessity for the Sewer District arose from "the increase in the amount of wastewater in the Metropolitan Cleveland area resulting from the increase in population and the expansion of industry * * *." Exhibit A, ¶ 3, 1972 Judgment.

{¶6} The Sewer District was formed for "the establishment of a total waste water control system for the collection, treatment and disposal of waste water within and without the District." *Id.* at ¶ 4. To effectuate that purpose, the Sewer District was charged with, among other things, planning, financing, constructing, operating, and controlling "waste water treatment and disposal facilities, major interceptor sewers, all sewer regulator systems and devices, weirs, retaining basins, storm handling facilities, and all other water pollution control facilities of the District." *Id.* at ¶ 5(c).

{¶7} The Sewer District's initial plan of operation was amended by various petitions and court orders, culminating in a 1975 court order that constitutes the Sewer District's Charter ("Charter").[5] Under the Charter, the Sewer District

> shall have authority pursuant to Chapter 6119 of the Ohio Revised Code to
> plan, finance, construct, maintain, operate, and regulate local sewerage

---

[4] The Northeast Ohio Regional Sewer District was originally named the Cleveland Regional Sewer District; its name was changed by court order to its current name in 1979.

[5] Although the Charter has been amended by other court orders, the core of it remains and governs this case.

collection facilities and systems within the District, including both storm and sanitary sewer systems.

Exhibit A, ¶ 5(m), 1975 Judgment.

{¶8} Exhibit A to the Charter recognizes the territory to be included in the Sewer District was to include "that portion of Cuyahoga County presently served, or mainly capable of being served by gravity, by sewers leading to the three wastewater treatment plants in the City of Cleveland plus the proposed Cuyahoga Valley Interceptor Sewer." Sewer District membership arose based upon the consenting member communities' need to connect to and use those facilities. The member communities include some from Cuyahoga, Summit, Lorain, and Lake Counties.

{¶9} Under the Charter, the plan for operation of the Sewer District entails the construction, operation, and financing of District and local facilities.

> The District will plan, finance, construct, operate and control wastewater treatment and disposal facilities, major interceptor sewers, all sewer regulator systems and devices, weirs, retaining basins, storm water handling facilities, and all other water pollution control facilities of the District * * *."

Exhibit A, ¶ 5(c), 1975 Judgment. The Charter provides the Sewer District's Board of Trustees with authority to determine rates for sewage treatment and disposal in accordance with its terms. *Id*. at ¶ 5(f).

{¶10} With regard to local sewerage collection facilities, the Charter provides:

> The District shall not assume ownership of any local sewerage collection facilities and systems nor shall the District assume responsibility or incur any liability for the planning, financing, construction, operation, maintenance, or repair of any local sewerage collection facilities and

systems unless * * * specifically provided for in a written agreement between the District and the respective local community.

*Id.* at ¶ 5(m).

**{¶11}** The Charter provides the Sewer District with regulatory authority over "all local sewerage collections facilities and systems in the District, including both storm and sanitary sewer systems." *Id.* at ¶ 5(m)(1). However, the Sewer District only has the authority to "assume the responsibility for operating, maintaining, and repairing local sewerage collection facilities when requested to do so by a local community and upon mutually agreeable terms." *Id.* at ¶ 5(m)(2). Likewise, the District is only authorized to construct local sewerage collection facilities and systems "when requested to do so by a local community and upon mutually agreeable terms." *Id.* at ¶ 5(m)(4). With regard to planning local sewerage collection facilities and systems, the Charter further charged the Sewer District with developing a capital improvement plan:

> The District shall develop a detailed integrated capital improvement plan for regional management of wastewater collection and storm drainage designed to identify a capital improvement program for the solution of all inter-community drainage problems (both storm and sanitary) in the District.

*Id.* at ¶ 5(m)(3).

**{¶12}** For financing local sewerage collection facilities and systems, "[t]he method of financing particular projects shall be agreed to between the District and the respective local communities at the time the project is undertaken by the District." *Id.* at ¶ 5(m)(5).

III.   Facts

**{¶13}** In January 2010, the Sewer District's Board of Trustees amended the District's Code of Regulations by enacting Title V, "Stormwater Management Code," which created a "Regional Stormwater Management Program" ("the RSM Program"). Under Title V, the Board defined the scope of its RSM Program, which included "planning, financing, design, improvement, construction, inspection, monitoring, maintenance, operation and regulation" of its own defined "Regional Stormwater System." Title V, Section 5.0501. The definition of "Regional Stormwater System" is expansively written to include the following:

> The entire system of watercourses, stormwater conveyance structures, and Stormwater Control Measures in the Sewer District's service area that are owned and/or operated by the Sewer District or over which the Sewer District has right of use for the management of stormwater, including both naturally occurring and constructed facilities. The Regional Stormwater System shall generally include those watercourses, stormwater conveyance structures, and Stormwater Control Measures receiving drainage from three hundred (300) acres of land or more. The Sewer District shall maintain a map of the Regional Stormwater System that shall serve as the official delineation of such system.

*Id.* at Section 5.0218.

**{¶14}** The stated purpose of Title V is to "establish the Regional Stormwater Management Program through which the District and each Member Community served by the Regional Stormwater Management Program shall work in a cooperative manner to address stormwater management problems." *Id.* at Section 5.0303. In broad terms, the RSM Program consists of the following:

> All activities necessary to operate, maintain, improve, administer, and provide Stormwater Management of the Regional Stormwater System and

to facilitate and integrate activities that benefit and improve watershed conditions across the Sewer District's service area.

*Id.* at Section 5.0219.

{¶15} As stated in Title V, the RSM Program was needed because

(a) Flooding is a significant threat to public and private property.

(b) Streambank erosion is a significant threat to public and private property, water quality, wildlife, and aquatic and terrestrial habitats.
(c) Inadequate stormwater management damages the water resources of Northeast Ohio, impairing the ability of these waters to sustain ecological and aquatic systems.

(d) A watershed-based approach to stormwater management is necessary to effectively and efficiently plan, design, construct, and maintain long-term solutions to stormwater problems.

(e) An adequate funding source is necessary to provide a watershed-based approach to stormwater management.

(f) Impervious surface on a given parcel relates to the volume, rate, and/or pollutant loading of stormwater runoff discharged from that parcel.

(g) The measurement of impervious surface that causes stormwater runoff provides an equitable and adequate basis for a system of fees for funding a watershed-based approach to stormwater management.

*Id*. at Section 5.0301.

{¶16} The Sewer District intends to fund projects under the RSM Program through the imposition of a stormwater fee. The fee is based on the square feet of a property's impervious surfaces, which are defined in Title V as follows:

Developed surfaces that either prevent or significantly slow the infiltration of water into the ground compared to the manner that such water entered the ground prior to development, or which cause water to run off in greater quantities or at an increased rate of flow than that present prior to development. Impervious surfaces shall include, without limitation,

rooftops, traveled gravel areas, asphalt or concrete paved areas, private access roads, driveways and parking lots, and patio areas.

*Id*. at Section 5.0210.

**{¶17}** "Based on analysis by the District of impervious surfaces on parcels throughout the District's service area, an impervious surface of three thousand (3,000) square feet shall be designated as one (1) Equivalent Residential Unit (ERU) * * *." *Id.* at Section 5.0706.

**{¶18}** For calculating the fee for residential properties, the Sewer District structured a three-tiered scale based on the size of the residential parcel. *Id.* at Section 5.0707. Residential parcels with less than 2,000 square feet of impervious surface will be classified as equal to 0.6 of an ERU and will be charged $3.03 per month in 2013. *Id.* Residential parcels with 2,000 to 3,999 square feet of impervious surface will be classified as equal to 1.0 ERU and will be charged $5.05 per month in 2013. *Id.* And residential parcels with 4,000 or more square feet of impervious surface will be classified as equal to 1.8 ERUs and charged $9.09 per month in 2013. *Id.*

**{¶19}** For nonresidential property owners, the Sewer District will individually determine their fees by measuring impervious surfaces on their parcels, and then multiplying (1) the total number of ERUs for a given parcel (which will be derived from calculating the total square feet of impervious surface divided by 3,000), by (2) the fee established per ERU, which is $5.05 per month in 2013. *Id*. at Section 5.0708.

{¶20} Title V requires that the collected fees be maintained in a separate account "dedicated to the implementation and administration of the Regional Stormwater Program * * *." *Id*. at Section 5.0701.

{¶21} Title V exempts certain properties from the fees: public road rights-of-way; airport runways and taxiways; railroad rights-of-way; parcels with less than 400 square feet of impervious surface; and "[p]arcels whose use has been designated as a Non-Self Supporting Municipal Function owned by Member Communities." *Id*. at Section 5.0705.

{¶22} Title V also has a "Community Cost-Share Program," which requires the Sewer District to place a minimum amount of all funds collected from the fees in a separate account for each of the 56 member communities to use for District-approved projects to "promote or implement the goals and objectives" of Title V within the member communities.[6] *Id.* at Sections 5.0901 and 5.0902.

{¶23} Credits are a part of Title V, and are available for applicants who maintain and operate stormwater-control measures. *Id*. at Section 5.0801. The credits consist of (1) stormwater-quantity credit, (2) stormwater-quality credit, (3) stormwater-education credit, and (4) residential credit. Credits can be combined for a maximum credit of 100 percent. *Id*. at Section 5.084.

---

[6] Title V set the minimum amount of funds that would go into the Community Cost-Share Program's account at 7.5 percent. However, the trial court ordered the Sewer District to increase the amount to 25 percent.

## IV. Procedural History

{¶24} In January 2010, on the same day that the District's Board of Trustees enacted Title V, the Sewer District filed this action in the trial court seeking (1) a judgment declaring that the Sewer District had the authority to implement its RSM Program with respect to all the member communities served by the District and (2) an order permitting the Sewer District to amend its Plan for Operation to include Title V. The 56 member communities were named as defendants.

{¶25} The trial court allowed the intervening property owners to join the action; they filed an answer and counterclaim.[7] The intervening property owners sought, among other things, to permanently enjoin the Sewer District from implementing its RSM Program. The appealing communities filed an answer and counterclaims, in which they also sought, among other things, to permanently enjoin the Sewer District from implementing its RSM Program.

{¶26} In June 2010, the appealing communities filed a motion to dismiss for lack of subject matter jurisdiction; the intervening property owners joined in the motion. In their motion, they contended, among other things, that the Sewer District could not obtain judgment because it failed to name as defendants the individual property owners within the Sewer District's service area.

---

[7] Other parties were also permitted to intervene in the action. The additional intervenors included Richard Lennon, Bishop of the Diocese of Cleveland in his capacity of Trustee of an Implied Charitable Trust, the Catholic Cemeteries Association of the Diocese of Cleveland, and the Cleveland Municipal School District Board of Education.

**{¶27}** The trial court denied the motion, and stated in regard to the failure to join claim, that there was no necessity that the Sewer District had to name all the property owners in the District because they were represented by the public officials of their respective communities.

**{¶28}** The parties filed motions for summary judgment. The Sewer District moved for partial summary judgment, seeking a determination that, under its Charter and statutory authority, it properly enacted Title V. The appealing communities, intervening property owners, and other defendants filed cross-motions for summary judgment on that issue. The issue of the validity and implementation of the stormwater fee was reserved for trial.

**{¶29}** In April 2011, the trial court issued its ruling on the summary judgment motions, finding that the Sewer District had the authority under R.C. Chapter 6119 and its Charter to enact its RSM Program.

**{¶30}** In late 2011, a bench trial was had on the issue of the validity and implementation of the stormwater fee. In February 2012, the trial court issued an opinion in which it found that the stormwater fee (1) was authorized under R.C. Chapter 6119, (2) was not restricted by the Sewer District's Charter, (3) was not an unauthorized tax, and (4) did not violate the parties' equal protection rights. The court further found the methodology used to calculate and impose the fee was constitutional.

**{¶31}** But the court found that there was no rational basis for the Sewer District's disparate treatment of nonresidential, as compared to residential, property owners. The

court also found that the 7.5 percent minimum allocation into the Cost-Share Program was unfair to the member communities, and that it should be no less than 25 percent.

{¶32} Moreover, relative to the stormwater education credit, the court ordered that the Sewer District "shall provide the school systems with appropriate curriculum for each of grades 1–12 to achieve the stated purposes of the credit." The court also ordered, relative to the credits in general, that the Sewer District "shall submit a plan or formula providing for the accrediting of costs of a licensed engineer in completing any applications for credits under the stormwater Fee Credit Manual."

{¶33} Post-trial proceedings were had relative to the trial court's orders. During those proceedings, the Sewer District submitted draft revisions to Title V, to which the appealing communities and intervening property owners objected. In June 2012, the trial court issued a supplemental journal entry, in which it adopted the Sewer District's revisions.

{¶34} The appellants filed a motion for reconsideration based on the Ohio Supreme Court's then-recent ruling in *Drees Co. v. Hamilton Twp.*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, which was issued approximately three months after the trial court's 2012 ruling. The trial court denied the motion.

V. The Appealing Communities and Intervening Property Owners' Assignments of Error

{¶35} The appealing communities and intervening property owners have assigned the following as errors:

I. The trial court erred in denying the Cities' and Property Owners' Counterclaims, to the extent that they sought permanently to enjoin the Sewer District from imposing and collecting its unlawful "Stormwater Fee."

II. The trial court erred in denying the Cities' and Property Owners' Counterclaims, to the extent that it sought permanently to enjoin the Sewer District from undertaking a comprehensive Stormwater Management Program (i.e., its Title V) for which it has no authority under R.C. Chapter 6119.

III. The trial court erred in denying the Cities' and the Property Owners' Counterclaims to the extent that they sought permanently to enjoin the Sewer District from undertaking an SMP[8] not authorized by its Charter.

IV. The trial court erred in denying the Cities' and Property Owners' Counterclaims, to the extent that they sought permanently to enjoin the Sewer District from undertaking its SMP, because that SMP, as applied, violates numerous Ohio and Federal Constitutional provisions.

V. The trial court erred in denying the Cities' and Property Owners' motion to dismiss because the trial court lacked subject matter jurisdiction due to Plaintiff's failure to join all necessary parties in the action.
VI. The trial court erred when it oversaw amendments to Title V after holding a trial and after its February 2012 Opinion declaring the rights of the parties.

## VI. The Sewer District's Cross-Assignments of Error

{¶36} In its cross-appeal, the District has assigned the following as errors:

I. The trial court erred in finding that there is no rational basis for disparate treatment of residential and nonresidential property owners with respect to the stormwater fee.

II. The trial court had no legal basis for requiring the District to provide the school systems with appropriate curricula for grades 1–12 to further the stated purpose of the stormwater education credit set forth in Title V.

---

[8] Stormwater management program.

III. The trial court had no legal basis for requiring the District to accredit costs of licensed engineers in completing nonresidential property owners' applications for credits available under Title V.

IV. The trial court had no legal basis for requiring the District to revise, or to increase the amount of, the community cost-share set forth in Title V.

## VII. Law and Analysis

### A. The Appellants' Appeal

1. The Stormwater Management Program and the Stormwater Fee Under R.C. Chapter 6119 and the District's Charter.

{¶37} Appellants' first, second, and third assignments of error relate to the authority of the Sewer District to implement Title V and the RSM Program, along with its associated stormwater fee.

{¶38} In their first assignment of error, the appellants contend that the stormwater fee is an unlawful tax. They further argue that even if it is not an unlawful tax, it is not authorized under R.C. 6119.09. In their second assigned error, the appellants contend the Sewer District has no authority under R.C. Chapter 6119 for undertaking a comprehensive stormwater management program. In their third assignment of error, the appellants argue that the RSM Program is not authorized by the Sewer District's Charter.

{¶39} Appellate review of summary judgment is de novo, governed by the standard set forth in Civ.R. 56. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving

party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party. Appellate review of a trial court's determinations regarding questions of law in a declaratory judgment action are also reviewed de novo. *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586.

{¶40} The District is a "creature of statute" whose authority is strictly limited to the powers specifically conferred upon it or clearly implied by the statute. *See In re Guardianship of Spangler*, 126 Ohio St.3d 339, 2010-Ohio-2471, 933 N.E.2d 1067, ¶ 17; *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536. "Implied powers are those that are incidental or ancillary to an expressly granted power; the express grant of power must be clear, and any doubt as to the extent of the grant must be resolved against it." *Spangler* at ¶ 17. The Sewer District does not have the power to extend the authority conferred on it by the General Assembly. *D.A.B.E., Inc.* at ¶ 38.

{¶41} The appellants contend that the Sewer District was "utterly without statutory power under R.C. Chapter 6119 to enact Title V * * *." They cite the following reasons in support of their contention: (1) the Sewer District had no express authority for its RSM Program under R.C. Chapter 6119; (2) the Sewer District's program is not in keeping with the purposes of R.C. Chapter 6119 as set forth in R.C. 6119.01; (3) other agencies such as watershed districts and conservancy districts are charged with dealing with stormwater-related issues; and (4) the definition of waste water in both R.C. 6119.011 and the Charter demonstrate that the Sewer District's RSM Program was not authorized.

**{¶42}** The first rule of statutory construction requires courts to look at a statute's language to determine its meaning. If the statute conveys a clear, unequivocal, and definite meaning, interpretation comes to an end, and the statute must be applied according to its terms. *Lancaster Colony Corp. v. Limbach*, 37 Ohio St.3d 198, 199, 524 N.E.2d 1389 (1988).

**{¶43}** Pursuant to R.C. 6119.01(A) and (B), the purpose of a regional water and sewer district is for "either or both" of the following purposes: "(A) [t]o supply water to users within and without the district"; and "(B) [t]o provide for the collection, treatment, and disposal of waste water within and without the district." "Waste water" is defined as "any storm water and any water containing sewage or industrial waste or other pollutants or contaminants derived from the prior use of the water." R.C. 6119.011(K). Essentially, the statutory terms authorize the Sewer District to collect, treat, and dispose of waste water entering the sewer system.

**{¶44}** The term waste water necessarily means water containing waste. Under R.C. 6119.011(K), "waste water means" "*any storm water containing sewage or other pollutants.*" (Emphasis added.) *Reith v. McGill Smith Punshon, Inc.*, 163 Ohio App.3d 709, 2005-Ohio-4852, 840 N.E.2d 226 (1st Dist.). Indeed, the District's own "waste water" definition in Titles I, II, and IV of its code of regulations recognizes it as a "combination of water-carried waste * * * together with such ground, surface or storm water as may be present."

{¶45} The General Assembly created regional sewer districts to "collect, treat, and dispose" of "waste water." Implicit in this express grant of power is that a Sewer District is charged with removing sewage or other pollutants from storm water as well as other water containing such waste. The definition of waste water cannot be read to authorize the Sewer District to unilaterally exercise control over a broad range of stormwater-related issues that are not mentioned under and bear no resemblance to the powers conferred through R.C. Chapter 6119.

{¶46} R.C. Chapter 6119 does not authorize the District to implement a "stormwater management" program to address flooding, erosion, and other stormwater issues or to claim control over a "Regional Stormwater System." Such terms appear nowhere in R.C. Chapter 6119. Unlike the authority granted to the Sewer District, the General Assembly gave specific stormwater-related authority to watershed districts and conservancy districts. *See* R.C. 6105.12 (providing watershed districts with authority to review and recommend plans for the development of the water resources), and R.C. 6101.04 (providing conservancy districts with authority to "prevent floods" and "regulating stream channels," "irrigation," "diverting * * * watercourses," and "arresting erosion.")

{¶47} In promulgating its RSM Program and in defining its terms, the Sewer District's board engaged in policy-making over matters that are legislative in nature. By engaging in such actions, the Sewer District has gone beyond administrative rule-making and usurped power delegated to the General Assembly.

[T]he board of trustees of a regional water and sewer district may provide a system of sanitary and/or storm water sewerage * * * for any part of the area included within the district.

R.C. 6119.19.

{¶48} With regard to the challenge to the stormwater fee being an unlawful tax,[9] we are cognizant that other jurisdictions have found stormwater charges are fees. We need not decide whether this is the case under Ohio law.[10] Rather, our focus is on whether the Sewer District possesses the authority under R.C. Chapter 6119 to implement its RSM Program and the associated stormwater fee.

{¶49} The stormwater fee is being imposed by the Sewer District to advance Title V and address regional stormwater management problems that will serve to benefit the entire region. The benefits to the community at large include decreasing flooding, preventing erosion, collecting sediment and debris, maintenance of various protective and control structures with a "regional stormwater system." Other benefits include improvements in water quality, habitat for wildlife and reduction of future costs relating to stormwater management. The Sewer District ignores the complete lack of any express grant of powers under R.C. Chapter 6119 relating to any of the RSM Program's regulatory objects.

---

[9] We note that R.C. 6119.17 and 6119.19 authorize the Sewer District to levy a tax for "any portion of the cost of one or more water resource projects[.]"

[10] In *Drees Co.*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, the Ohio Supreme Court set forth a number of factors for analyzing the substance of an assessment to determine whether it is a fee or a tax.

**{¶50}** R.C. 6119.09 provides in part that, "[a] regional water and sewer district may charge, alter, and collect rentals or other charges * * * for the use or services of any water resource project or any benefit conferred thereby and contract * * * with one or more persons * * * desiring the use or services thereof, and fix the terms, conditions, rental, or other charges * * * for such use or services."   R.C. 6119.09.

**{¶51}** Additionally, R.C. 6119.06 governs the rights, powers, and duties of a regional water and sewer district, and provides that the district may, in relevant part, do the following:

> [a]cquire, construct, reconstruct, enlarge, improve, furnish, equip, maintain, repair, operate, lease or rent to or from, or contract for operation by or for, a political subdivision or person, water resource projects within or without the district

R.C. 6119.06(G);

> [c]harge, alter, and collect rentals and other charges for the use of services of any water resource project as provided in section 6119.09 of the Revised Code.   Such district may refuse the services of any of its projects if any of such rental or other charges, including penalties for late payment, are not paid by the user thereof * * *

R.C. 6119.06(W); and

> [d]o all acts necessary or proper to carry out the powers granted in Chapter 6119 of the Revised Code.

R.C. 6119.06(BB).

**{¶52}** A "water resource project" is defined under R.C. 6119.011(G) as "any waste water facility or water management facility acquired, constructed, or operated by or

leased to a regional water and sewer district or to be acquired, constructed, or operated by or leased to a regional water and sewer district under this chapter * * *."

**{¶53}** In this case, we find the stormwater fee was unrelated to any use or services afforded to a property owner by a "water resource project." This case is wholly unlike the tap-in fee charged in *Wyatt v. Trimble Twp. Waste Water Treatment Dist.*, 4th Dist. Athens No. 1521, 1992 Ohio App. LEXIS 5749 (Nov. 3, 1992), where the charge was for the installation of a plug-in system at the point where each premises was to be connected to an existing sanitary sewer and waste water treatment project as authorized by R.C. 6119.09(Z), and which project was found necessary to bring the communities into compliance with the Clean Water Act (Federal Water Pollution Control Act) (33 U.S.C. 1251 et seq.).

**{¶54}** Here, there was no service connection being made from the properties to a water resource project. Further, Kyle Dreyfus Wells, the Sewer District's manager of watershed programs, testified that the stormwater management plan plays no more than an incidental role in municipal compliance with Clean Water Act regulatory obligations. Tr. 1531-1534.

**{¶55}** Finally, while R.C. 6119.06(BB) authorizes the Sewer District to do all acts necessary to carry out its authorized powers, the Sewer District cannot exceed the authority granted. While the Sewer District's authority is broad, we are unable to conclude that the legislature intended to allow the Sewer District to expand upon its

statutory authority through Title V and its RSM Program and impose an unauthorized charge.

{¶56} Here, the Sewer District improperly employed R.C. 6119.09 to generate revenues for the costs of its RSM Program. The waste water fee was not for the "use or service" of a "water resource project." Accordingly, we find that the stormwater fee is not a legitimate "rental or other charge" under R.C. 6119.09.

{¶57} We further recognize that in this case, there was no vetting as to the allowance for the Sewer District to fund its stormwater management program with a stormwater fee. By implementing the stormwater fee, the Sewer District has effectively taken upon itself to claim a share of community dollars, while other public entities such as school districts must continue their struggle to obtain public funding.

{¶58} We find that the General Assembly has not indicated any intent through R.C. Chapter 6119 to vest regional water and sewer districts with the authority to adopt a stormwater management program or to implement the stormwater control measures set forth in Title V. The General Assembly did not intend to permit the Sewer District to expound upon its own powers without any oversight, proclaim the scope and breadth of its authority over stormwater management issues, and impose an associated stormwater fee. There is no doubt that with the increased development in the region over the last several decades, regulations are needed over the stormwater-related issues that plague the region. However, such regulatory authority must be explicitly granted by the General

Assembly. Therefore, we conclude the enactment of Title V exceeds the statutory powers conferred upon the District under R.C. Chapter 6119.

{¶59} The appellants further contend that the Sewer District's RSM Program is not authorized under the Charter for the following three reasons: (1) the Charter dealt with sanitary sewerage issues and considerations that "share no kinship" with the Sewer District's RSM Program; (2) Title V conflicts with Charter provisions limiting the Sewer District to charging for sewer fees; and (3) Title V conflicts with Charter provisions prohibiting the Sewer District from assuming ownership, control, or responsibility for locally controlled systems without the local community's written consent.

{¶60} Consistent with R.C. Chapter 6119, the Charter set forth the Sewer District's purpose of "the establishment of a total wastewater control system for the collection, treatment and disposal of waste-water within and without the District." Exhibit A, ¶ 4, 1975 Judgment. The Charter's provisions pertain to the operation, construction, and financing of the Sewer District's sewage treatment and other water pollution control facilities, as well as local sewerage collection facilities and systems. The Charter provides the Sewer District with authority over "wastewater treatment and disposal facilities, major interceptor sewers, all sewer regulator systems and devices, weirs, retaining basins, storm water handling facilities, and all other water pollution control facilities." *Id*. at ¶ 5(c).

{¶61} Through its enactment of Title V, the District unilaterally defined a "local stormwater system" and created an expansive definition of a "regional stormwater

system" over which it claims the power to establish and administer its RSM Program. The expansive scope of the "regional stormwater system" goes far beyond the scope of sewage treatment and waste water handling facilities under the Charter and encompasses the following:

> The entire system of watercourses, stormwater conveyance structures, and Stormwater Control Measures in the Sewer District's service area that are owned and/or operated by the Sewer District or over which the Sewer District has right of use for the management of stormwater, including both naturally occurring and constructed facilities. * * *

Title V, Section 5.0218.

{¶62} Further, while the Sewer District may charge for "sewage treatment and disposal," the Charter does not authorize the District to impose a fee for a stormwater management program. The Charter contemplates charges assessed for the use of the Sewer District's wholly-owned treatment facilities, with rates encompassing planning expenses, operation and maintenance expenses, and capital costs for existing and future waste-water handling facilities. Exhibit A, ¶ 5(f), 1975 Judgment.

{¶63} Insofar as the Charter authorizes the district to assume the ownership, responsibility, or liability for any local sewerage collection facilities and systems, it may do so only at the request of the local community and upon mutually agreeable terms provided for in a written agreement. *Id.* at ¶ 5(m)(2) and (4). With regard to local sewerage and collection facilities, while the Sewer District was charged with developing a "detailed integrated capital improvement plan for regional management of wastewater collection and storm drainage," it was within the confines of its authority "to plan local

sewerage collection facilities and systems pursuant to Chapter 6119 of the Ohio Revised Code." *Id*. at ¶ 5(m)(3). Also, the method of financing particular projects must be "agreed to between the District and the respective local communities at the time the project is undertaken by the District." *Id*. at ¶ 5(m)(5).

{¶64} Finally, in order to amend its Charter, the Sewer District is required to go through the Charter amendment process of R.C. 6119.051. "The approved petition filed under R.C. 6119.02 and the approved plan of operation for the district filed under R.C. 6119.04 may only be amended or modified by the Common Pleas Court upon a petition being filed containing a request for such amendment or modification." *Kucinich v. Cleveland Regional Sewer Dist.*, 64 Ohio App.2d 6, 410 N.E.2d 795 (8th Dist. 1979), syllabus. Any amendment to the Charter cannot exceed the authority conferred by R.C. Chapter 6119.

{¶65} Here, the Sewer District's board, whose composition is largely unknown to the general public, met and decided the long-term future of all water management in the region well into the next generation.

{¶66} There is no question the Sewer District and many of its individual board members have done great things over the years for the region. There is also no doubt that there have been problems that must be addressed. The sheer size and power of the Northeast Ohio Regional Sewer District[11] is daunting. The consent decree the District signed with the Federal Environmental Agency in 2011 is enlightening:

---

[11] Also known as "NEORSD."

NEORSD serves all or part of 62 communities and over one million people in a 350 square-mile tributary area, 80 square miles of which is served by combined sewers. NEORSD is responsible for operation and maintenance of 305 miles of interceptor sewers including 40 miles of intercommunity relief sewers. The system includes 126 permitted combined sewer overflow outfalls and 26 automated regulators. These facilities were built as early as 1876.

NEORSD is responsible for operation and maintenance of three WWTPs [waste water treatment plants], Easterly, Southerly and Westerly, which were built in 1922, 1928, and 1922 respectively. Improvements to these plants have been made continuously.

NEORSD is also responsible for operation and maintenance of the Combined Sewer Overflow Treatment Facility (CSOTF) located near the Westerly plant, which was constructed in 1983.

NEORSD states that it has invested over $2.0 billion in facilities and collection system improvements since 1972, and has spent over $850 million to reduce CSO discharges by nearly 50%.

NEORSD states that between 1972 and 2006, NEORSD constructed the Northwest Interceptor, Cuyahoga Valley Interceptor, Southwest Interceptor and Heights/Hilltop Interceptor. These interceptors have diverted approximately 1.65 billion gallons of sanitary flow out of the combined system directly to the WWTPs.

In addition, NEORSD states that it has taken certain incremental steps to reduce CSO discharges that it believes are in compliance with EPA's CSO Policy. It states that these steps are:

(a) NEORSD completed a system-wide CSO Facilities Plan Phase I Study in 1994;

(b) Pursuant to its CSO NPDES Permit, NEORSD's CSO Operational Plan was submitted in 1998 and approved by Ohio EPA in 1999;

(c) In 1995 NEORSD began developing its CSO Long Term Control Plan, which is embodied in separate Facilities Plans for the Mill Creek, Westerly, Southerly and Easterly sewersheds. Facility planning efforts included interceptor inspection and evaluation, extensive system investigation,

mapping and flow monitoring during facilities planning, and sewer and stream modeling;

(d) NEORSD submitted for Ohio EPA approval the Mill Creek and Westerly Facilities Plans in 1999, and the Southerly and Easterly Facilities Plans in 2002;

(e) In 2008 NEORSD completed its studies of feasible alternatives to minimize wet weather bypasses at the Southerly and Easterly WWTPs;

(f) Implementation of the District's facilities plans has included rehabilitation and early action projects in all three treatment plant service areas. The early action projects have controlled approximately 480 million gallons of CSO;

(g) NEORSD has completed construction of the major portion of the Mill Creek Tunnel, which is designed to reduce overflows to Mill Creek by over 500 million gallons per year.

NEORSD states that it has imposed appropriate and necessary rate increases to pay for these efforts. The District states that it has raised rates in 17 out of the last 20 years, in amounts varying from 4.5% to 22.2%, resulting in rate increases during this period of 350%.

*See* Case: 1:10-cv-02895-DCN Doc #: 23 Filed: 07/07/11.

{¶67} The view that an entity with the size and expanse of the Sewer District could redefine its own existence through Title V from the confines of a boardroom with limited oversight and review is not supported by R.C. Chapter 6119. While local school boards and municipal entities struggle with limited budgets, the Sewer District expands its authority and imposes its will on constituents with limited oversight and control. Clearly, if regional entities like the Sewer District are going to expand their power and redefine their purpose, albeit for a claimed good purpose, it should be accomplished by the legislature's defining the terms and the scope of authority of these entities to make

these changes.  Further, long-term stormwater management is interrelated with regional expansion and what some have termed "urban sprawl."  Clearly, if one or the other is to be comprehensively addressed, it must be done with authority conferred by the legislature.

**{¶68}** Accordingly, we find that Title V exceeds the express statutory authority granted to the Sewer District under R.C. Chapter 6119 and the authority conferred under the Charter.  We further find that the stormwater fee is an unauthorized charge. Appellant's first, second, and third assignments of error are sustained.

2.      Title V and Constitutional Provisions

**{¶69}** Having already sustained the first, second, and third assignments of error, we need not address the constitutional challenges raised by appellants. Accordingly, we find the fourth assignment of error is moot.

3.      Denial of Motion to Dismiss based on Failure to Join all Property Owners

**{¶70}** For their fifth assigned error, the appellants contend that the trial court erred in denying their motion to dismiss for lack of subject matter jurisdiction because all of the individual property owners were not named as parties.   We disagree.

**{¶71}** Civ.R. 19(A) governs "[p]ersons to be joined *if feasible*," and provides in part as follows:

> A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (a) as a practical matter impair or impede his ability to

protect that interest or (b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest, or (3) he has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee.

(Emphasis added.)

{¶72} Joinder of all the thousands of property owners was not feasible, and the property owners' interests were protected by the community law directors. *See* R.C. 733.53 ("[t]he city director of law, when required to do so by resolution of the legislative authority of the city, shall prosecute or defend on behalf of the city, all complaints, suits, and controversies in which the city is a party, and such other suits, matters, and controversies as he is, by resolution or ordinance, directed to prosecute").

{¶73} In light of the above, the fifth assignment of error is overruled.

4.     Post-Trial Amendments

{¶74} In their sixth and final assignment of error, the appellants contend that the trial court erred when it oversaw post-trial amendments to Title V.

{¶75} The trial court's February 2012 judgment concludes, in part, as follows: "[t]he Court will set a conference within 30 days and hear proposed changes to Title V * * *.  Upon its conclusion, [the District] shall submit a proposed journal entry not inconsistent with this opinion."

{¶76} The appellants filed notices of appeal from the February 2012 judgment, but this court dismissed the appeals as not being taken from a final order because the trial court contemplated further action.  *N.E. Ohio Regional Sewer Dist. v. Bath Twp.*, 8th

Dist. Cuyahoga Nos. 98108 and 98112, motion Nos. 453509 and 453511, respectively.

The appellants filed motions to reconsider, which this court denied, stating as follows:

> The trial court's opinion on February 15, 2012 specifically directs that, at the conclusion of a future hearing, the "[p]laintiff shall submit a proposed journal entry not inconsistent with this opinion." The opinion clearly contemplates that future action must be taken before any judgment of the court becomes final. Therefore, it is not an appealable order.

*Id.* at motion Nos. 453917 and 453855.

**{¶77}** In light of the above, the trial court's February 2012 judgment was not its final judgment and its subsequent judgment issued in June 2012 was proper. The seventh assignment of error is, therefore, overruled.

B. The Sewer District's Cross-Appeal

**{¶78}** In the trial court's February 2012 opinion, which it issued after the bench trial, the court found that certain provisions in Title V needed to be modified; the court charged the District with making the modifications before legally implementing Title V. The District revamped the offending provisions, which were presented to the trial court in a June 2012 report. The trial court found the District's revisions acceptable and adopted them in its June 2012 final judgment. The District's assignments of error relate to findings the trial court made in its February 2012 opinion.

**{¶79}** Under its assignments of error, the District contends that (1) the trial court erred in finding that there was no rational basis for distinguishing between residential property owners and nonresidential property owners with respect to the stormwater fee; (2) the trial court had no legal basis for requiring the District to provide the school

systems with appropriate curricula for grades 1–12; (3) the trial court had no legal basis for requiring the District to come up with a formula for accrediting the costs of licensed engineers for completing any applications for credit; and (4) the trial court had no legal basis for requiring the District to revise, or to increase the amount of, the community cost-share set forth in Title V.

{¶80} Since the trial court rendered its decision, the District voluntarily adopted changes to Title V that rendered its assignments of error moot. Generally, an appeal from a judgment with which the appellant has voluntarily complied renders the appeal moot. *Sunkin v. Collision Pro, Inc.*, 174 Ohio App.3d 56, 65-66, 2007-Ohio-6046, 880 N.E.2d 947, citing *Am. Book Co. v. Kansas*, 193 U.S. 49, 52, 24 S.Ct. 394, 48 L.Ed. 613 (1904). In any event, because we have already determined that Title V is invalid, we need not address the District's assignments of error.

{¶81} Nonetheless, we do express concern over the trial court's revisions to Title V in an effort to correct what the court viewed as infirmities. It is not within the province of the court to draft such measures. Moreover, any expansion of the Sewer District's powers, including the allowance for implementation of a stormwater management program and the parameters thereof, are matters that must be determined by the legislature.

## VIII. Conclusion

**{¶82}** The trial court's ruling on the motion to dismiss is affirmed. We reverse the trial court's decision granting partial summary judgment in favor of plaintiff-appellee/cross-appellant and its decision denying the motion for a permanent injunction. The judgment of the trial court on the declaratory action is reversed; judgment is entered in favor of appellants as follows:

1. The Sewer District is enjoined from implementing Title V and its Regional Stormwater Management Program. The Sewer District had no authority under R.C. Chapter 6119 or its Charter to enact it.

2. The Sewer District is enjoined from implementing, levying, and collecting its stormwater fee. The Sewer District has no authority under R.C. Chapter 6119 or its Charter to enact said fee.

**{¶83}** Affirmed in part; reversed in part.

It is ordered that appellants recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

KENNETH A. ROCCO, J., CONCURS (WITH SEPARATE OPINION);
LARRY A. JONES, SR., P.J., DISSENTS (WITH SEPARATE OPINION)


KENNETH A. ROCCO, J., CONCURRING:

{¶84} While I agree with the majority opinion's disposition of this appeal, I write separately only because I disagree with the majority opinion's characterization of the Sewer District's actions in ¶ 47. Using the word "usurp" to describe what the Sewer District sought to accomplish is too strong.

{¶85} In my view, the district simply was making a well-meaning effort to deal with Northern Ohio's need for clean water. That need should be a high priority in this state, especially in light of the fact that Lake Erie and its watercourses arguably are Ohio's greatest natural resource.

{¶86} As the majority opinion suggests, the need for clean water is one that can no longer be handled locally. The Ohio legislature, nevertheless, delegated most of the responsibility of safeguarding this natural resource to local governments, thus abdicating its proper role. Nature abhors a vacuum. So, too, apparently, does the Sewer District. Because I believe that the District merely was making a misguided attempt to deal with a comprehensive problem that affects the health and welfare of the citizens of this area, I would choose to describe the Sewer District's action as having inappropriately assumed the mantle of responsibility from which the government of the state of Ohio has walked away.

LARRY A. JONES, SR., P.J., DISSENTING AND CONCURRING:

{¶87} Respectfully, I dissent as to the decision to sustain the first, second, and third assignments of error of appellants' appeal. I concur as to the decision to overrule (1) appellants' fifth assignment of error regarding the denial of their motion to dismiss based on failure to join all property owners and (2) appellants' sixth assignment of error regarding the trial court's jurisdiction to make post-trial amendments. Moreover, while I agree with the majority that the appellees' cross-appeal is moot, I do not share the same concerns about issues raised in the appeal as the majority does.

I.   Authority for Title V

{¶88} The powers granted to a regional water and sewer district under R.C. Chapter 6119 are "very broad." *Wyatt v. Trimble Twp. Waste Water Treatment Dist.*, 4th Dist. Athens No. 1521, 1992 Ohio App. LEXIS 5749, *6 (Nov. 3, 1992). The majority agrees that the "Sewer District's authority is broad," but it is "unable to conclude that the legislature intended to allow the Sewer District to expand its statutory authority through Title V and its RSM Program and impose an unauthorized charge." Majority Opinion, ¶ 55.

{¶89} I do not believe that Title V is an unlawful expansion of the District's statutory authority; rather, I believe that it is specifically authorized under the governing statutory authority, both procedurally[12] and as I will discuss in more detail, substantively.

---

[12]*See* R.C. 6119.051(A), providing that "[a]t any time after the creation of a water and sewer district, the district, after action by its board of trustees, may file a petition in the court of common pleas requesting the order of such court permitting the district to:   (A) Increase or add to its purposes

Further, I believe that the District's Program is authorized under its Charter.   I also do not believe that the fee imposed under the Program is an unauthorized charge.

Express Authority under R.C. Chapter 6119

**{¶90}** The purpose of a regional water and sewer district is for "either or both" of the following purposes:   "(A) [t]o supply water to users within and without the district"; and "(B) [t]o provide for the collection, treatment, and disposal of waste water within and without the district."   R.C. 6119.01(A) and (B).   "Waste water" is defined as "any *storm water* and any water containing sewage or industrial waste or other pollutants or contaminants derived from the prior use of the water."   (Emphasis added.)   R.C. 6119.011(K).

**{¶91}** The majority holds that under the statutory definitions, in order to qualify as waste water, storm water must be mixed with water containing sewage or industrial waste or other pollutants or contaminants.   I disagree.

**{¶92}** It is true that, generally, the word "and" is a conjunctive.   *McIntire v. Patrick*, 85 Ohio Misc.2d 83, 87, 684 N.E.2d 391, 1997 Ohio Misc. LEXIS 274 (C.P.). But the conjunctive "and" and the disjunctive "or" are sometimes used interchangeably. *See Skiba v. Mayfield*, 61 Ohio App.3d 373, 378, 572 N.E.2d 808 (11th Dist.1989). "[W]e are not empowered to read into the law that which is not there, and it is our duty to give effect to the plain meaning of the statute's language."   (Citation omitted.)   *Id.*

___

heretofore approved by the court so long only as its purposes are those described in section 6119.01 of the Revised Code * * *."

Statutes should not be construed to produce unreasonable or absurd results. *State ex rel. Dispatch Printing Co. v. Wells*, 18 Ohio St.3d 382, 384, 481 N.E.2d 632 (1985).

**{¶93}** In interpreting the definition of R.C. 6119.011(K) under its plain language, I would find that waste water is (1) "any storm water" or (2) "any water containing sewage or industrial waste or other pollutants or contaminants derived from the prior use of the water."

**{¶94}** I believe to find otherwise would create an absurd result. Specifically, if the District could manage storm water only if it was mixed with polluted or contaminated water, then it would also necessarily only be able to manage polluted or contaminated water if it was mixed with storm water. I do not think that the General Assembly intended such a result.

**{¶95}** I am not persuaded by the majority's reliance on *Reith v. McGill Smith Punshon, Inc.*, 163 Ohio App.3d 709, 2005-Ohio-4852, 840 N.E.2d 226 (1st Dist.), which was decided on a statute-of-limitations issue on the plaintiffs-property owners' claims of negligence and trespass due to flooding of their driveway, yard, and home.

**{¶96}** In deciding the limitations issue, the court had to consider whether there was a "legal distinction between storm water when it is above the ground and storm water when it is channeled through underground pipes." *Id.* at ¶ 24. The plaintiffs contended that surface water becomes sewer water once it enters an underground pipe, but the court disagreed, stating that "[s]ewage is defined as any substance containing excrement, while waste water means any storm water containing sewage or other pollutants." *Id.* at ¶ 29.

The majority relies on this narrow statement for its finding that storm water must contain pollutants or contaminants.

**{¶97}** But, the issue in *Reith* differed from the issue here, and if the First Appellate District intended to hold that in all instances waste water can *only* be storm water mixed with polluted water, I respectfully disagree.

**{¶98}** Morever, I am not persuaded by the majority's citation to the District's definitions in *other* Titles of its Code of Regulations to support its finding that waste water is limited to only storm water mixed with pollutants or contaminants. The definitions in those Titles apply to those Titles. I believe for our purpose, we are restricted to the definition of waste water set forth in R.C. 6119.011(K). Under that section, I would find that waste water can be (1) "any storm water" or (2) "any water containing sewage or industrial waste or other pollutants or contaminants derived from the prior use of the water."

**{¶99}** The majority states that the General Assembly has charged other statutorily created agencies such as watershed districts under R.C. 6105.12 or conservancy districts under R.C. 6101.04 to deal with stormwater-related issues. But neither a watershed district created under R.C. 6105.12 nor a conservancy district created under R.C. 6101.04 have the *exclusive authority* to implement a program such as the District's Program. Therefore, the issue in this case is whether the District has the authority to implement its Program.

{¶100} I am also not persuaded by the proposition that the governing statutes mandate that waste water be "'collected' and 'treated' and 'disposed of,' conjunctively," and that a regional sewer district is an "entity that exists to do that "'collecting, treating, and disposing of waste water.'"

{¶101} In my view, the plain meaning of R.C. 6119.01(B) grants the District authorization to collect, treat, or dispose of waste water. To hold that it must do all three conjunctively would create absurd results.

Title V vis-a-vis the District's Charter

{¶102} The Charter states that the District's purpose was the "establishment of a total wastewater control system for the collection, treatment and disposal of wastewater within and without the District * * *." Exhibit A to 1975 Charter, ¶ 4. The Charter further provides that the District

> shall have regulatory authority over all local sewerage collection facilities and systems in the District, including both storm and sanitary sewer systems. This authority shall be exercised by the District through rules and regulations adopted by the Board of Trustees pursuant to Chapter 6119 of the Ohio Revised Code.

*Id.* at ¶ 6(m)(1).

{¶103} Moreover, the Charter charged the District with developing a plan for regional storm water management:

> [t]he District shall develop a detailed integrated capital improvement plan for regional management of wastewater collection and storm drainage designed to identify a capital improvement program for the solution of all intercommunity drainage problems (both storm and sanitary) in the District.

*Id.* at ¶ 5(m)(3).

**{¶104}** The charge given to the District in its Charter "shares kinship" with Title V, which stated purpose is to "establish the Regional Stormwater Management Program through which the District and each Member Community served by the Regional Stormwater Management Program shall work in a cooperative manner to address stormwater management problems." Title V, Section 5.0303. Further, Title V describes the Program as

> [a]ll activities necessary to operate, maintain, improve, administer, and provide Stormwater Management of the Regional Stormwater System and to facilitate and integrate activities that benefit and improve watershed conditions across the District's service area.

*Id.* at Section 5.0219.

**{¶105}** Given the above, I would hold that the District's Charter authorized implementation of its Program as set forth in Title V.

Ownership, Control, or Responsibility for Locally-Controlled Systems without Local Community's Written Consent

**{¶106}** I do not see the District's Program as conflicting with the requirement, as stated in the Charter, that the District cannot own, control, or be responsible for locally-controlled systems without the local community's written consent.

**{¶107}** Title V explicitly provides that the District's member communities will remain responsible for owning and maintaining their own facilities and systems. For example, section 5(k) of the Title provides as follows: "[i]ndividual suburban communities will retain ownership of all local suburban facilities, subject to the

provisions of subsection 'm' below."   Subsection m provides that the District will not be responsible for any local sewerage collection facility absent written consent between the District and the respective local community.

{¶108} Thus, under the plain language of Title V each member community will remain responsible for maintaining its local sewerage collection facilities and systems. To that end, the District stipulated on the record that it will not undertake any construction projects under Title V, without the consent of the member community in which the project will be undertaken.   *See* April 2011 opinion at 3; February opinion at 12.

II. The Stormwater Fee Under Title V

{¶109} I disagree with the majority's finding that the stormwater fee is "not a legitimate 'rental or other charge' under R.C. 6119.09."   Majority Opinion, ¶ 56.

{¶110} The majority finds that *Wyatt*, 4th Dist. Athens No. 1521, 1992 Ohio App. LEXIS 5749, is completely distinguishable from this case because the issue there involved a tap-in fee for premises to be connected to an existing sanitary sewer and waste water treatment project.   The fact remains, however, that the Fourth Appellate District concluded that a sewer district's powers under R.C. Chapter 6119 are "very broad."   The broadness, as it relates to fees or charges, is indicated by the very use of the words "other charge" in R.C. 6119.09.   The "other charge" in *Wyatt* was a tap-in fee, while the "other charge" here was a fee for stormwater management.   I believe both are permissible under R.C. Chapter 6119.

**{¶111}** Further, I believe that the projects that will be funded through the fees in this case are for the benefit of the member communities and property owners.

**{¶112}** For example, one of the District's experts, Hector Cyre,[13] was of the opinion that projects under the Program would "provide service to not only the member communities individually and cumulatively, but to the property owners within those communities."

**{¶113}** Another example of the benefits of the District's Program from the testimony of two mayors from the non-appealing member communities.[14] The mayors testified about "serious" regional stormwater problems in their communities, such as home and yard flooding, damage to the Metroparks, road damage, and degradation and siltation of the Shaker Lakes and dams. The mayors testified that they believed the District's Program will help to alleviate these problems and, thus, provide an "enormous benefit" not only to their residents, but to residents of the region generally.

**{¶114}** Because I believe that the District's Program was authorized under R.C. Chapter 6119 and that it provides a benefit, I would not be persuaded by the appellants' argument that the District was required to pay for its Program through other revenue-generating procedures. According to the appellants, the District should have

---

[13]Cyre, founder and owner of Water Resource Associates, has provided consultation for hundreds of stormwater utility programs throughout the United States and internationally since the early 1970s.

[14]*See* the testimony of Earl Leiken, Mayor of Shaker Heights and Bruce Rinker, Mayor of Mayfield Village.

sought to raise revenues through the procedures outlined in R.C. 6119.17, 6119.18, or 6119.42.

{¶115} R.C. 6119.17 and 6118.19 require voter approval; but, they each are for a tax.   For the reasons I will discuss below, I would find that the fee here is not a tax.

{¶116} R.C. 6119.42 governs special assessments and provides in part that:

> [a]ny regional water and sewer district may levy and collect special assessments as provided in Chapter 6119 of the Revised Code. The board of trustees of such district may assess upon abutting, adjacent, contiguous, or other specially benefited lots or lands in the district all or any part of the cost *connected with the improvement of any street, alley, or public road or place, or a property or easement of the district* by constructing any water resource project or part thereof which the board declares conducive to the public health, safety, convenience, or welfare * * *.

(Emphasis added.)

{¶117} Pursuant to the plain language of the statute, the construction of a water resource project is incidental to improving "any street, alley, or public road or place, or a property or easement of the district."   Such is not the circumstance here and R.C. 6119.42 is, therefore, not applicable.

{¶118} The appellants also contend that the District could have issued water resource revenue bonds and notes under R.C. 6119.12.   The District could have; but it chose to fund its Program through a fee ("other charge") imposed under R.C. 6119.09, and I would find that proper.

{¶119} Further, I would find untrue the appellants' contention that, under the District's Charter, the only fees the District are allowed to charge are sewer fees.

{¶120} The Charter specifically provides that

[a]ny projects not financed through the Ohio Water Development Authority, State of Ohio or Federal Government would be financed in such a manner as may be deemed appropriate by the Board of Trustees.

Exhibit A to 1975 Charter, at ¶ 5(e)(3).

{¶121} The District's Board of Trustees unanimously approved the storm water fee on January 7, 2010, and therefore, I believe the fee is proper under the Charter.

{¶122} The majority declines to address the application of *Drees Co. v. Hamilton Twp.*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, to this case, but I believe it is instructive. In *Drees*, the Ohio Supreme Court held that "impact fees" imposed by Hamilton Township, a limited-home-rule township, were a prohibited form of taxation.

{¶123} The township's board of trustees passed a resolution that set forth a schedule of fees to be charged to applicants for zoning certificates for new construction or development. Four categories of fees were included in the resolution: (1) a road-impact fee; (2) a fire-protection-impact fee; (3) a police-protection-impact fee; and (4) a park-impact fee. The purpose of the resolution was set forth as follows:

> The purpose of the impact fee is to benefit the property by providing the Township with adequate funds to provide the same level of service to that property that the Township currently affords previously developed properties.

> The Resolution assesses an impact fee to previously undeveloped property, and property undergoing redevelopment, to offset increased services and improvements because of the development.

*Id.* at ¶ 3.

{¶124} The amount of the fees varied based on the land use. The fees collected were to be deposited in impact fee accounts, rather than into a general fund. Each of the

four types of fees had its own account, and the funds in each of the four accounts were to be used only for the purpose of its accompanying category.

**{¶125}** The trial court and the Twelfth Appellate District upheld the imposition of the fees, finding, among other things, that they were not a prohibited form of taxation. The Ohio Supreme Court disagreed, however.

**{¶126}** The court relied on its analysis in *State ex rel. Petroleum Underground Storage Tank Release Comp. Bd. v. Withrow*, 62 Ohio St.3d 111, 579 N.E.2d 705 (1991), in determining whether the impact fees were a fee as opposed to a tax. At issue in *Withrow* were assessments imposed by the Petroleum Underground Storage Tank Release Compensation Board on owners and operators of underground storage tanks. The assessments helped fund the Petroleum Underground Storage Tank Financial Assurance Fund, whose purpose was to reimburse the owners and operators of the tanks for the costs of corrective actions taken when petroleum was released into the environment, and to compensate third parties for bodily injury or property damage, or both, resulting from such a release. The proceeds from the assessments were segregated from the general fund of the state treasury.

**{¶127}** The Ohio Supreme Court cited four reasons for finding that the assessments in *Withrow* were a fee rather than a tax. First, the court noted that the assessments were imposed to advance regulatory measures that addressed the environmental problems caused by the leaking underground storage tanks. Pursuant to statutory regulations, owners and operators of underground storage tanks were strictly

liable to take corrective measures when leaks occurred and to pay damages for the leaks. The fund into which the fees were paid ensured that owners and operators could meet those statutory requirements.

{¶128} Next, the court noted that the assessments were not placed in the general fund and were to be used only for "'narrow and specific purposes, all directly related to [underground storage tank] problems.'" *Drees* at ¶ 18, quoting *Withrow* at 116-117.

{¶129} Third, the court stated that a "'fee is a charge imposed by a government in return for a service it provides.'" *Drees* at ¶ 19, quoting *Withrow* at 117. In *Withrow*, the fund into which the fees were paid "operated essentially, as insurance coverage for catastrophic damage caused by leaking tanks." *Drees* at ¶ 23.

{¶130} And fourth, the court was "persuaded by the fact that when the unobligated balance in the fund exceeded a certain amount, there would be no assessment for that year." *Drees* at ¶ 20. Likewise, if the fund "dipped below a certain amount, the assessing authority was permitted to charge a supplemental assessment." *Id.* In light of this, the court noted that the "'assessment appears to function more as a fee than as a tax, because a specific charge in return for a service is involved.'" *Drees* at *id.*, quoting *Withrow* at *id.*

{¶131} Applying *Withrow* to the facts in *Drees*, the court found that the township's assessments were taxes. The court first noted that the assessments the township imposed were not in "furtherance of statutes designed to protect the public from harms associated with a specific industry," as compared to the fee imposed in *Withrow*. *Drees* at ¶ 21.

{¶132} Second, the court noted that although the funds collected by the township were segregated and not placed into the general fund, the funds were "spent on typical township expenses inuring to the benefit of the entire community." *Id.* at ¶ 22.

{¶133} Next noted by the court was that the fee imposed by the township did not provide the assessed party any "particular service above that provided to any other taxpayer * * *." *Id.* at ¶ 23. In other words, as taxpayers and residents of the township, the assessed parties were entitled to police and fire protection and use of the township's parks and roadways: "targets of the assessment receive no greater benefit than any other taxpayer despite the payment of the additional assessment." *Id.*

{¶134} In regard to the fourth and final *Withrow* factor, the court in *Drees* found that the spending of the funds collected through the township's assessment was based on the "whims of government," as opposed to the assessment in *Withrow*, which was "tied to events." *Id.* at ¶ 24.

{¶135} Considering this case in light of *Withrow* and *Drees*, I would find that the charge here is more like the assessment in *Withrow*, that the Ohio Supreme Court held was a fee and not a tax.

{¶136} First, the fee is being imposed by the District to advance regulatory measures. Specifically, the purpose of Title V is to "establish the Regional Stormwater Management Program through which the District and each Member Community served by the Regional Stormwater Management Program shall work in a cooperative manner to address stormwater management problems." Title V at Section 5.0303.

{¶137} A regional sewer district is an

> independent political subdivision created under R. C. Chapter 6119, and * * * everything related to it is governed by R. C. Chapter 6119. This includes its formation and operation. The cities, counties, townships and the courts are bound by the provisions of R. C. Chapter 6119, and both the formation of the district and its operation must be conducted within the confines of R. C. [C]hapter 6119.

*Kucinich v. Cleveland Regional Sewer Dist.*, 64 Ohio App.2d 6, 15-16, 410 N.E.2d 795 (8th Dist.1979).

{¶138} Thus, Title V is regulatory in nature because it is "designed to address stormwater problems," aligned with the purpose of providing for the "collection, treatment, and disposal of waste water" under R.C. 6119.01(B).

{¶139} The second *Withrow* factor suggesting that the charge is truly a fee rather than a tax is present here. That is, the funds generated from the fees will be maintained in a separate account "dedicated to the implementation and administration of the Regional Stormwater Program * * *." Title V at Section 5.0701.

{¶140} Third, the charge imposed by the District is in return for the specific service of managing stormwater runoff, which suggests that it is a fee rather than a tax. And fourth, the final *Withrow* factor suggests that the District's charge is a fee rather than a tax. Specifically, the charge is based on the increased demand for stormwater services, and the fee that each property owner is required to pay under Title V is in return for the specific service of managing the stormwater runoff.

{¶141} In light of the above, I would hold that the charge imposed by the District is not a tax, but rather, a permissible "other charge" under R.C. 6119.09.

III. Title V and Constitutional Provisions

{¶142} Because the majority sustains the appellants' first, second, and third assignments of error, it does not address the constitutional challenges raised by appellants. Because I disagree with the majority, I would review their constitutional challenges and find them to be without merit for the reasons briefly discussed below.

A. Equal Protection

{¶143} The appellants contend that Title V violates the Equal Protection Clauses of the United States and Ohio Constitutions because it treats similarly-situated persons differently in that it: (1) is imposed only on property owners within the District's sanitary service area, as opposed to all property owners within the District's county-wide authority; (2) treats residential and non-residential property owners differently without a rational basis for doing so; (3) discriminates against small lot owners; (4) ignores the impact of stormwater runoff from non-impervious surfaces; (5) exempts certain properties without a rational basis; (6) offers credits without a rational basis; and (7) discriminates against some property owners who, for "remedial work benefitting the general public and others who do not pay," will be forced to "pay to fix runoff problems others create."

{¶144} "[A] statute that does not implicate a fundamental right or a suspect classification does not violate equal-protection principles if it is rationally related to a legitimate government interest." *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, 930 N.E.2d 770, ¶ 39, citing *Eppley v. Tri-Valley Loc. School Dist. Bd. of Edn.*, 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401, ¶ 15. Here, neither a

fundamental right nor a suspect classification are implicated; therefore, review of Title V should determine whether it is rationally related to a legitimate government interest.

{¶145} "Ohio courts grant substantial deference to the legislature when conducting an equal-protection rational-basis review." *Williams*, *supra* at ¶ 40, citing *State v. Williams*, 88 Ohio St.3d 513, 531, 2000-Ohio-428, 728 N.E.2d 342.

Application only to Property Owners in District's Sanitary Service Area

{¶146} The appellants first contend that the Program violates equal protection safeguards because, although the "original Charter gave the Sewer District authority throughout Cuyahoga County," the current Program "applies only to properties within the District's Service Area."

{¶147} Specifically, the appellants contend that "multiple arbitrary classifications among Sewer District properties" will be created because Cuyahoga County property owners in the non-member communities and excluded portions of member communities will not be required to pay the fee, while some property owners in member communities will be required to pay the fee, despite all the property owners being located in the same watersheds in the same county.

{¶148} The District's authority is limited to its member communities, who voluntarily joined the District in whole or part. Thus, I would find the appellants' argument is without merit.

Residential vs. Non-Residential Property Owners

{¶149} The appellants contend that the District's formulas for charging residential and non-residential properties "reveals their arbitrary, discriminatory effects." The trial court agreed, and ordered an adjustment. That adjustment is the part of the District's cross-appeal and will be addressed in my discussion there.

Small Lot Owners

{¶150} The appellants also contend that the District's fee schedule discriminates against small lot owners. They rely on the testimony of Michael Clar, their expert witness, who testified that the fee for small lot owners is inequitable because larger lots will produce proportionately more runoff-water than is accounted for in the District's formulary. The District presented the testimony of Hector Cyre, Andrew Reese, and Francis Greenland, however, that I would find demonstrated a rational basis for the difference.

{¶151} For example, Reese, a hydrologist who has worked primarily in the area of municipal stormwater engineering, testified that, in addition to being the most common way for a district to calculate the fee, the District considered the particular situation of the member communities and used the system it found most "equitable" and "accurate." Reese testified that other options were considered along with the impervious surface method, but based on the District's particular situation, the District concluded that the impervious surface measurement method would most fairly distribute the costs.

Exemptions

{¶152} Further, based on testimony of some of the District's witnesses, I would find a rational basis existed for the exemptions, which are for the following properties: public road rights-of-way; airport runways and taxiways; railroad rights-of-way; parcels with less than 400 square feet of impervious surface; and "[p]arcels whose use has been designated as a Non-Self Supporting Municipal Functions owned by Member Communities."

{¶153} Greenland, the director of watershed programs for the District, testified that public roads are exempt from the Program because they function as part of the storm drainage system, and are highly engineered and designed to deal with drainage issues and the proper conveyance of stormwater. Greenland also testified that public roadways, unlike private ones, are routinely maintained by local governments through allocation of public funds, thus, the reason for their exemption.

{¶154} Further Cyre, founder and owner of Water Resource Associates, testified about the tendency to exempt public roads. According to Cyre, public roads are often exempt because the municipality has been the "primary installer of the stormwater infrastructure," and has "borne a large proportion of the capital cost of putting storm sewers and inlets and catch basins in." Moreover, the street surface itself is sometimes a component of the stormwater system.

{¶155} Cyre also testified about the exemption for airport runways and taxiways. According to Cyre, "airports are among the most controlled sites around," meaning that they have runway areas, ramps, tarmacs, fueling stations, and de-icing pads, all of which

"get stormwater off of the surfaces and into a control facility" such as a detention facility or wetland.

{¶156} Greenland testified about the exemption for railroad rights-of-way as follows: "[r]ailroad rights-of-way essentially are large linear ribbons, with highly engineered ballasts. Any railroad is designed to really mimic an impervious surface. It gets the water up and out really, in their linear, ribbon-like nature."

{¶157} Greenland further testified about the exemption for "non-self-supporting municipal functions."[15] Greenland explained that the exemption was based on the exemption in the court order establishing the District.[16] Further, the exemption was a cost-cutting measure for the municipalities.

{¶158} In regard to the exemption for parcels with less than 400 square feet of impervious surface, Greenland testified that the District chose that cut-off because many of those properties did not even show on the aerial photographs, which is how the impervious surface measurements are taken.

---

[15]"Non-self-supporting municipal functions" are defined as "[m]unicipal functions of Member Communities that are exempt from sewage charges as provided for in the judicial orders establishing the District. This exemption applies to municipal buildings which can be shown to house functions that are not proprietary in nature, including city halls, police and fire departments, service garages, and recreational facilities such as parks, playgrounds, indoor recreational facilities, swimming pools, and ice rinks." Title V, Section 5.0214.

[16]The original court order establishing the District provided: "All non-self supporting municipal functions of the City of Cleveland shall continue to receive sewage service free of charge and the Board of Trustees shall afford the same treatment to similar non-self supporting municipal functions of the suburban municipalities as soon as possible after it commences operation of the system."

Stormwater Runoff from Non-Impervious Surfaces

{¶159} According to the appellants, the District's program is also unconstitutional because it "ignores the significant stormwater runoff impact from non-impervious surfaces." The District presented testimony demonstrating why impervious surfaces are used. Through that testimony, it was explained that because the regional system consists mostly of natural watercourses, it was more fair and equitable to use impervious surfaces to calculate the fee. Prior to arriving at that determination, other funding mechanisms were evaluated. But it was determined that basing the fee solely on impervious surfaces would be the most equitable way to apportion the costs of the Program. I would hold that the District's determination was constitutionally sound and proper under both R.C. Chapter 6119 and the District's Charter.

Stormwater Education Credit

{¶160} The appellants contend that the stormwater education credit "lacks all trace of a connection to either the school's runoff impacts or to the Sewer District's purported * * * goals." I disagree. The credit was designed to educate youth about utilizing stormwater management practices, such as the use of rain barrels or rain gardens. With education about these practices, the District hopes that future demand on the stormwater system will be reduced, which is in line with the District's goals.

B.    Substantive Due Process

{¶161} As with the equal protection review, the appellants' claims of substantive due process violations is under a rational basis standard because neither a fundamental right nor suspect classification is implicated. *Akron v. Rasdan*, 105 Ohio App.3d 164,172-173, 663 N.E.2d 947 (9th Dist.1995).

{¶162} The crux of the appellants' claim of due process violation is that the fees are not equitable and the "impervious surface calculation method" is arbitrary and unreasonable.   I will discuss the extent to which the fees differ between residential and non-residential property owners in addressing the District's cross-appeal.   On all other grounds, for the reason discussed herein, I would find the appellants' claim of due process violation meritless.

C.    Home Rule Amendment and Utility Power

{¶163} Article XVIII, Section 3, of the Ohio Constitution is commonly referred to as the Home Rule Amendment, and authorizes municipalities

> to exercise all powers of local self-government and to adopt and enforce
> within their limits such local police, sanitary and other similar regulations,
> as are not in conflict with general laws.

{¶164} Article XVIII, Section 4, of the Ohio Constitution grants municipalities utility power as follows:

> [a]ny municipality may acquire, construct, own, lease and operate within or
> without its corporate limits, any public utility the product or service of
> which is or is to be supplied to the municipality or its inhabitants, and may
> contract with others for any such product or service.

**{¶165}** The appellants contend that Title V violates the Home Rule Amendment and its right to power over their utilities.    I disagree.

**{¶166}** Of significant importance to my resolution of these issues is the fact that the District's member communities *voluntarily* joined the District.    *See Seven Hills v. Cleveland*, 1 Ohio App.3d 84, 90, 439 N.E.2d 895 (8th Dist.1980) (stating that R.C. Chapter 6119 "must necessarily be construed as not contemplating involuntary inclusion."). In joining the District, the communities agreed that the District "shall have regulatory authority over all local sewerage collection facilities and systems in the District, including both storm and sanitary sewer systems."    Title V, ¶ 5(m)(1). Moreover, under Title V, the District seeks collaboration with its member communities.[17] From my view, the District does not seek to manage stormwater runoff in a vacuum. And, in fact, many of the 56 member communities did collaborate with the District in developing the Program under Title V, and only 11 member communities are appealing. The remaining 80% of the member communities have voiced no objection to the trial court's judgments.

---

[17] *See, e.g.*, Title V, Section 5.0502, stating that the District's "services, programs, and initiatives shall be supportive of District and Member Community goals and objectives * * *"; Section 5.0504, stating that the District "shall establish Watershed Advisory Committees," the rules, policies and procedures for which "shall be available for Member Community review and comment"; Section 5.0504(b), stating that the Watershed Advisory Committee "shall * * * [a]ssist the District in determining Regional Stormwater Management Program activities and priorities in each watershed. The recommendations of Watershed Advisory Committees shall be considered during the preparation of each Stormwater Master Plan"; Section 5.0506, providing that construction projects "shall involve Member Community and Watershed Advisory input"; and Section 5.0508, requiring that member communities provide the district with plans for any stormwater management project and requiring that the District will review the plans and "provide and review comments * * *."

{¶167} By way of example of the District's collaboration with the member communities, and their response, in a chart summarizing "Round 1 Meetings" with city officials from the member communities, the support was overwhelmingly in favor of the District managing stormwater runoff issues, including support from some of the appealing communities. Under the comments from a February 2008 meeting with officials from one of the appealing communities, Bedford Heights, it was noted that the city was "[s]upportive, see[s] the need" and from an October 2007 meeting with officials from Brecksville, it was noted "[s]upportive. They see District can help them work with their neighboring communities, and with [the] Turnpike Commission."[18]

{¶168} Moreover, Section 5.0107 of Title V provides: "[n]othing in this Title shall be construed to infringe upon or supplant a Member Community's, or other local government's, power and responsibility, however derived, to plan, finance, construct, maintain, operate, and regulate the Local Stormwater System within their jurisdiction."

{¶169} In light of the above, I would overrule the fourth assignment of error.

IV. The District's Cross-Appeal

{¶170} I agree with the majority that an appeal from a judgment with which the appellant has voluntarily complied generally renders the appeal moot. *Sunkin v. Collision*

_____

[18]To be fair, the same chart noted that some of the appealing communities were opposed. For example, under the comments from a January 2008 meeting with Lyndhurst officials, it was noted: "We don't need this. No flooding problems except golf course, and we don't really care about them. You're 5 years too late." From a January 2008 meeting with Strongsville officials, it was noted, "[w]e'll be glad to help out in your 'study' but don't even think about charging a fee. It will drive commercial owners out of our city. We rely on them for taxes, and we're competing against Medina County."

*Pro, Inc.*, 174 Ohio App.3d 56, 65-66, 2007-Ohio-6046, 880 N.E.2d 947 (9th Dist.), citing *Am. Book Co. v. Kansas*, 193 U.S. 49, 52, 24 S.Ct. 394, 48 L.Ed. 613 (1904). But I do not share the majority's concern about the trial court "overstepping" its boundaries to "draft legislative measures."

{¶171} As noted by the majority, the required process for implementing such a program as the one at issue here was for the District to file a petition with the common pleas court for amendment or modification of the plan of operation that originally created the District. *See* R.C. 6119.051. The District followed the process by filing this action. The trial court could accept the District's Program so long as the amendment or modification is in keeping with the purposes of R.C. 6119.01. *Id.*

{¶172} I believe, subject to the standard below, that after hearing and reviewing the voluminous testimony and exhibits presented during the bench trial, the trial court was within its authority to make amendments or modifications to the District's Program that were in line with the purposes of R.C. Chapter 6119.[19]

{¶173} I would review the trial court's modifications, therefore, like I would review any trial court judgment in a civil case; that is, to determine whether it is against the manifest weight of the evidence. *KeyBank Natl. Assn. v. Mazer Corp.*, 188 Ohio App.3d 278, 2010-Ohio-1508, 935 N.E.2d 428, ¶ 36 (2d Dist.). In the civil context, a judgment will not be reversed by a reviewing court as being against the manifest weight

---

[19] *See Cleveland v. N.E. Ohio Regional Sewer Dist.*, 8th Dist. Cuyahoga No. 55709, 1989 Ohio App. LEXIS 3589 at * 10-*11 (Sept. 14, 1989), seeming to imply that a trial court does have authority under R.C. 6119.051 to make amendments or modifications of a sewer district's plan.

of the evidence if there is some competent, credible evidence going to all the essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

Disparate Treatment of Residential and Non-Residential Property Owners

{¶174} In its first assignment of error, the District contends that the trial court erred in finding that there was no rational basis for distinguishing between residential property owners and non-residential property owners. I disagree.

{¶175} The District calculated the stormwater fee for each property using an "equivalent residential unit." Each unit represents 3,000 square feet of impervious surface. Under the District's initial plan, non-residential property owners were to be charged in multiples of the "equivalent residential unit," while residential property owners' "equivalent residential units" were established in three tiers.

{¶176} The District describes the fee as being based on "all impervious surfaces within the District's service area * * *" (Title V, Section 5.0223) "based on the incremental increase in the demand on the Regional Stormwater System caused by development on parcels of land." (District's Answer Brief, p. 11).

{¶177} I agree with the trial court that there was no rational basis for charging nonresidential property owners based on the exact amount of impervious surfaces on their property, while fluctuating the charge for residential property owners. The "incremental increase in demand" is not affected by whether the property owner uses the property for

residential or commercial purposes and, thus, there was no rational basis for treating the two groups differently.

**{¶178}** In light of the above, I would overrule the first assignment of error.

Stormwater Education Credit

**{¶179}** Under Title V, schools within the District that provide "*approved* stormwater pollution prevent curricula to their students that meet and maintain at least the minimum requirements of the Stormwater Fee Credit Policy Manual  may receive a Stormwater Fee Credit * * *."   (Italics added; underscore sic.)   *Id.* at Section 5.0804(c).

**{¶180}** The trial court found that the credit was a "rational way to advance a legitimate governmental interest," but required the District to provide the curriculum. The District contends in its second assignment of error that the trial court had no legal basis for such an order.  In light of the fact that the credit may only be earned by providing approved curricula that are compliant with the District's policy manual, I would find that the court's order was legally sound.

**{¶181}** I would overrule the District's second assignment of error.

Accrediting Costs for Licensed Engineers

**{¶182}** For its third assignment of error, the District contends that the trial court had no legal basis for requiring it to come up with a formula for accrediting the costs of licensed engineers for completing any applications for credit.   According to the District, "reimbursing engineering costs was not factored into the District's plan for the Program and projected revenue requirements."

**{¶183}** I would find the trial court acted legally in requiring the accreditation, and limited it so that it would not be a financial burden to the District and thus counterproductive to its Program. Specifically, the trial court ordered that an engineer's credit cannot exceed 10 percent of the stormwater fee and the credit will only be available to nonresidential property owners, including school districts.

Increase in the Community Cost Share

**{¶184}** Under the "Community Cost-Share Program" in Title V, the District "shall form a financial account * * * that shall be for the aggregation and dissemination of funds derived from revenues collected from the Stormwater Fee and whose purpose is to provide funding to assist in Member-Community-requested and District-approved projects." Title V, Section 5.0901. The title initially required that at least 7.5 percent of the "total annual revenue collected in each Member Community shall be allocated to that Member Community * * *." *Id.* at Section 5.0903(a).

**{¶185}** In its February 2012 opinion, the trial court found that because "as much of 78 percent of the watershed may be outside of District control," the minimum 7.5 percent cost share was "unfair to member communities because many flooding problems are in areas that drain far less than 300 acres,[20] and the communities are in need of additional funds to deal with these local stormwater issues." The trial court ordered that

---

[20]"Regional Stormwater System" is defined under Title V, in part, to include "watercourses, stormwater conveyance structures, and stormwater control measures receiving drainage from three hundred (300) acres of land or more." *Id.* at Section 5.9218.

[e]ither the meaning of 'regional' must be arrived at by means of a consensus of the District and its member communities or cost share must reflect an amount no less than 25 percent to member communities for local stormwater projects.

{¶186} I would find that the trial court's increase was legally sound. Sufficient evidence was presented demonstrating that the District's original 7.5 percent cost share was inadequate to address the problems that the District hopes to solve.

## V. Conclusion

{¶187} I believe Title V was authorized under both the District's Charter and Ohio Law. As such, I respectfully dissent from the majority's decision to the contrary. Further, I also believe the trial court acted legally in making modifications to the Title. As such, I respectfully dissent from the majority's "concerns" in that regard.

{¶188} I concur with the majority's judgment affirming the denial of appellants' motion to dismiss based on failure to join all property owners. I also concur with the majority's judgment affirming the trial court's jurisdiction to make post-trial amendments.

{¶189} In light of the above, I would overrule all the assignments of errors presented in both the appellants' appeal and the appellees' cross-appeal and affirm the trial court's judgments in toto.